UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

J. BLAIR HAYES                          )
                                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )        Case No. 1:08-cv-0150-RCL
                                        )
KATHLEEN SEBELIUS, Secretary,           )
                                        )
U.S. Department of                      )
Health and Human Services,              )
                                        )
                    Defendant.          )
_____)

**Memorandum Opinion**

This matter comes before the Court on defendant's Motion for Summary

Judgment. Mot. Summ. J., May 24, 2010, ECF No. 48. Having carefully considered

defendant's Motion, plaintiff's Opposition, defendant's Reply, the entire record in this

case, and the applicable law, the Court will grant defendant's Motion in part and deny it

in part. A review of the background of the case, the governing law, the parties'

arguments, and the Court's reasoning in resolving those arguments follows.

**I.    Background**

    **A. Introduction**

J. Blair Hayes brings this lawsuit against the Secretary of the Department of

Health and Human Services.[1] Suing under Title VII of the 1964 Civil Rights Act, Hayes

alleges that HHS discriminated against him because of his race and retaliated against him

---

[1] Hayes originally named Michael O. Leavitt in his official capacity as Secretary of HHS as defendant in
this case. Complaint 1, January 25, 2008, ECF No. 1.  When Kathleen Sebelius took over as Secretary of
HHS, she simultaneously became the defendant. Fed. R. Civ. P. 25(d).

for bringing a discrimination claim. He contends that HHS (1) denied him a Deputy Director position on an acting basis; (2) denied him the same Deputy Director position on a permanent basis; (3) lowered his performance appraisals for 2006; (4) lowered his performance appraisals for 2007; (5) placed him on a Performance Improvement Plan in 2008; (6) unfairly monitored his job performance; (7) unfairly criticized his job performance; and (8) made him perform job duties outside his position description, all out of illegal discriminatory and retaliatory animus. He also contends that retaliatory animus was a "motivating factor" in HHS's decision to deny him the Permanent Deputy Director position. He argues that even if that illicit motive was not the sole or but-for cause of HHS's decision, a reasonable jury could still find HHS liable under Title VII.

HHS responds that many of Hayes's allegations are not based on employment actions severe enough to constitute adverse employment actions (or materially adverse employment actions in the retaliation context) for Title VII purposes. It further argues that its decisions regarding Hayes were based on neither discrimination nor retaliation but were instead the result of Hayes's lack of qualifications relative to Joel Anthony—the person ultimately selected as Acting and Permanent Deputy Director—and Hayes's poor job performance generally. Finally, HHS contends that Hayes may not, as a matter of law, raise a motivating-factor retaliation claim under Title VII.

### B. The Agency's Structure

HHS is the United States government's principal agency for protecting and promoting the health of Americans.  The Administration for Children and Families is the component of HHS responsible for federal programs that promote the economic and social well-being of children and families. ACF's Office of Administration helps it

2

administer these programs and consists of four divisions: the Office of Grants Management, the Office of Financial Services, the Office of Management Resources, and the Office of Information Services.

### C. Hayes's Background

Hayes, an African American, became ACF's first-ever Procurement Advisor in January 2003. Hayes Dep. 48, Aug. 28, 2009, ECF No. 48-3. The GS-15 Step 10 position was created especially for him as part of the settlement of an EEO case he filed against HHS in 2001. *Id.* at 49–56. Hayes's primary responsibility was to advise ACF staff on acquisition issues. *Id.* at 56–58. Specifically, he was to "[p]rovide[] expert advice and counsel to ACF officials on procurement issues, develop[] guidance, [and] ensure[] compliance with applicable regulations, rules and policies." Mot. Summ. J. Ex. 4 at ECF p. 2. His duties also included "performing various tasks necessary to analyze, evaluate, and improve ACF management practices or systems as they relate to acquisition practices." *Id.*

### D. The Acting Deputy Director Position

Until August of 2006, Hayes's first-level supervisor was Robert Velasco, the Deputy Director in the Office of Administration. Hayes Dep. 60–61. His second-level supervisor was Curtis Coy, the Deputy Assistant Secretary for the Office of Administration. Coy Dep. 5, 28, Apr. 15, 2009, ECF No. 48-5. After learning that Velasco was leaving the Office of Administration, Coy looked to fill the Deputy Director position on a temporary basis. *Id.* 64–66. He sought his four Division Directors' input and asked each of them whether they had any interest in taking the position. *Id.* The Division Directors at that time were Joel Anthony, Tony Hardy, Cheryl Jones, and

Michael Curtis. *Id.* 53–54. Hardy and Jones are African American, and Anthony and Curtis are white. Hayes Dep. 90.

Curtis and Jones expressed no interest in the position. Curtis Dep. 106–07, Apr. 23, 2009; Jones Dep. 93, Apr. 21, 2009. After considering it overnight, Hardy told Coy that he "wasn't really interested in it, but . . . that if asked, [he] would do the deputy position." Hardy Dep. 71, Apr. 27, 2009; Coy Dep. 76–77. Anthony told Coy that "he'd be excited to take [the position]." Coy Dep. 75–77. Having gauged his four division directors' individual interests, Coy met with them about whom to put in the job. Hardy Dep. 74. Ultimately, he made Anthony the Acting Deputy Director. Coy Dep. 80–81.

Hayes was on a three-week vacation when this selection process took place, Coy Dep. 82–87; Hayes Dep. 92–93, 95–97, and returned to find that Coy had made Anthony Acting Deputy Director while he was away. Hayes Dep. 102. In nearly four years in the office, Hayes never once expressed any interest in the Deputy Director post. Hayes Dep. 93, 95–98. But upon learning of Coy's decision, he let Coy know for the first time that he would have been interested in it. *Id.* at 102–03. Although he would not have received any extra compensation for filling the Acting Deputy Director position, he desired it because he saw it as a "possible stepping stone to a SES [Senior Executive Service] position." *Id.* at 101.

### E. The Permanent Deputy Director Position

Coy began looking to fill the Deputy Director position permanently in December 2006. Statement Undisputed Facts Support Mot. Summ. J. 7, May 24, 2010, ECF No. 48-2. He was under no obligation to send out a solicitation of interest and could have simply made Anthony the Deputy Director unilaterally and without any extra process. Coy Dep.

122–24. Explaining that he "wanted to be fair to everyone" who might be interested in the position, though, he solicited interest in the job ACF-wide. Statement Undisputed Facts Support Mot. Summ. J. 7. In the end, only Hayes and Anthony applied. Coy Dep. at 127; Ivery Dep. 84–86.

Hayes does not dispute that Anthony was the better-qualified candidate. Anthony had worked in grants policy, management positions, and the President's Management Agenda. Anthony Aff. at ECF pp. 5–6, November 5, 2007, ECF No. 55-15. Having begun his federal career in 1974, Anthony had managed several of ACF's grants-related offices as well as the development of its Grants Administration Policy Manual in 1995. *Id.* at ECF p. 5. He managed several "operations" offices—the offices that award and administer contracts and grants—as well as "policy" offices. *Id.* This experience was of particular importance to the Deputy Director position because ACF is a grant-making agency with a $48 billion grants budget, and nearly every one of its significant initiatives involves grants and grants management. *Id.*

With nearly twenty-five years' experience as a federal supervisor performing the entire array of supervisory responsibilities, Anthony had managed several large financial management organizations, including one with 60 employees. *Id.* at ECF pp. 5–6. Anthony's experience did not go unnoticed. He received the highest possible performance rating—Outstanding—the past ten years in a row. *Id.* at ECF p. 6. In 2001, he received the ACF Distinguished Achievement Award, and in 2004, he received the highest honor bestowed on managers at ACF—the ACF Honor Award for Exemplary Leadership. *Id.* Hayes, while rated Excellent several times, never received a single

Outstanding rating and garnered no similar awards recognizing any significant leadership qualities. Hayes Dep. 223.

Hayes did not have any functional responsibilities within the Office of Administration's four divisions. Coy Decl. ¶ 4, May 10, 2010, ECF No. 55-11. He had never been a grants officer, had never assigned or awarded a grant, had never been responsible for administering a grant, had never received training in administering a grant, and he did not have any level of certification in the grants certification process. Hayes Dep. 141–43. He also had no responsibility for information technology or management resources. *Id.* 12–48. Finally, Hayes did not supervise any employees from 2003–2006. *Id.* at 60; Coy Decl. ¶ 3. From 1997–2001, he had supervised a staff of 14 people, and in the 1980s he supervised a staff of four. Statement Undisputed Facts Support Mot. Summ. J. 8. In fact, another reason Hayes was interested in the position was that he saw it as a chance to be a supervisor again. Hayes Dep. 101.

Coy had a panel interview both candidates. Coy Dep. 127–28. The panel consisted of Coy, Segundo Pereira—the Director of Diversity Management and the Acting Deputy Assistant Secretary for Acquisition Policy at HHS—and Diane Dawson. Dawson, an African American, is the Director of ACF's Office of Regional Operations. *Id.*; *see also* Dawson Dep. 13, 22–23, Apr. 21, 2009, ECF No. 48-10; Pereira Dep. 13–14, 26, Apr. 23, 2009, ECF No. 48-11; Hayes Dep. at 124–25. The panel interviewed the candidates one after the other, asking them the same questions. Pereira Dep. 34, 42; Dawson Dep. 33; Coy Dep. 133–34.

The panel interviewed Hayes first. Pereira Dep. 45; Dawson Dep. 33. Despite having not interviewed in fifteen years, Hayes did nothing to prepare for the interview

other than review his application. Hayes Dep. 122–23. He was "surprised" by the questions at the interview, which included "what would you do in your first thirty days on the job," *id.* at 128–29, and acknowledged that he had no "concrete" ideas about "what [he] wanted to do as Deputy Director." *Id.* 130–31. He also expressed no substantive thoughts on what challenges faced the Deputy Director or what the Deputy Director's priorities should be. *Id.* at 134–35. Anthony, on the other hand, appeared prepared for the interview and provided much more comprehensive answers to the panel's questions. Pereira Dep. at 72; Dawson Dep. 51–53. His answers reflected the breadth of his experience at HHS, including his extensive work on grants and acquisition matters. Dawson Dep. 51–53.

After discussing the candidates, all three panel members concluded that Anthony was clearly the better candidate. Pereira Dep. 69, 73–74; Dawson Dep. 56; Coy Dep. 135–36. Pereira testified that Hayes's interview was "the model of how not to interview." Pereira Dep. 80. Coy found that "it was apparent . . . that Mr. Anthony had prepared for the interview, [and that he] had answers that were cogent and thoughtful and Mr. Hayes was not so much." Coy Dep. 136. Dawson said that "Mr. Hayes's responses were much more narrow and sort of not clearly, in [her] opinion, understanding the scope and the breadth of the functions that were in that office, compared to Anthony who seemed to know a lot about—a lot of different areas." Dawson Dep. 53. Based on the unanimous recommendation of the panel members, Coy selected Anthony to be Deputy Director. Coy Dep. 135–36.

### F. Performance Appraisals

Hayes received annual performance appraisals as procurement advisor. Hayes Dep. 222–23. He received a rating of Excellent for 2003, 2004, and 2005. *Id.* For each of these reviews, Velasco rated his performance. Statement Undisputed Facts Support Mot. Summ. J. 11. In September 2006, before he left the Office of Administration, Velasco gave Hayes a summary rating of Excellent. *Id.* In December 2006, Anthony prepared his "final rating," and said, "The Summary Rating prepared by Robert Velasco on September 6, 2006 will be the final rating of record for Mr. Hayes. For the past couple of months, my observation of his performance is consistent with the summary rating. His final rating of record is Excellent." *Id.* at 11–12. Coy did not change the rating Velasco and Anthony gave Hayes. *Id.* at 12. Notably, Velasco gave summary ratings to all of the employees under his supervision before he left the office. Anthony Dep. 158–59. Neither Anthony nor Coy changed any of these ratings. *Id.*

Hayes refused to sign his 2006 performance rating, something he had not done in prior years. *Id.*; Hayes Dep. 184–85. He wrote, "I refuse to sign the evaluation. I feel this rating is not accurate and Mr. Anthony has intentionally rated me below the rating I deserve." Hayes Dep. 185. He believed he should have received an Outstanding rating because Coy cited his projects in a September 29, 2006, e-mail thanking the Office of Administration for their "contributions over the past year." Mot. Summ. J. Ex. 2 at ECF p. 8, May 24, 2010, ECF No. 48-17.

Coy and Anthony observed a steady decline in Hayes's job performance in 2007. Coy Aff. ¶ 7, May 10, 2010, ECF No. 48-7; Anthony Aff. ¶ 15, April 23, 2010, ECF No. 48-9. They rated his performance on four individual performance outcomes and one

administrative requirement. Statement Undisputed Facts Support Mot. Summ. J. 17. The first individual performance outcome was based on Hayes's proactively working toward HHS's procurement consolidation efforts, communicating information to Office of Administration staff on procurement policies and procedures, and analyzing new or proposed procurement legislation, regulations, and testimony to determine their impact on ACF. *Id.* They rated Hayes Minimally Successful on this requirement because his efforts regarding procurement consolidation were neither proactive nor effective. *Id.* He also failed to communicate information to ACF staff on new or revised federal and HHS procurement policies and procedures, including analyzing new or proposed procurement legislation to determine its impact on ACF programs. *Id.* In fact, he failed to provide any analysis of the numerous 2007 federal acquisition circulars. *Id.*

The second individual performance outcome required Hayes to assist the Deputy Secretary and Deputy Director in fulfilling their management priorities and to provide oversight of the issuance of ACF credit cards, including maintaining information on the card holders and approvers. *Id.* They rated him Minimally Successful on this requirement because he provided neither Anthony nor Coy with useful reports on the status of ACF procurement matters during the year. *Id.* He also failed to have much, if any, involvement in the ACF credit card program. *Id.*

The third individual performance outcome required Hayes to assist ACF customers in choosing efficient and effective procurement strategies. *Id.* at 18. Anthony and Coy rated Hayes Fully Successful on this requirement. *Id.*

The fourth individual performance outcome required Hayes to provide oversight for the Procurement Tracking System. *Id.* They rated Hayes Minimally Successful on this

requirement because it was unclear to Anthony and Coy that Hayes had done anything with respect to the Procurement Tracking System. *Id.* He did not provide them with useful reports regarding the system, and he did not take any action to ensure that the system's information on ACF's intranet was current. *Id.* As far as Anthony could tell, nothing new on the system had been added to ACF's intranet that year. *Id.*

The administrative requirement called on Hayes to identify and communicate his individual developmental needs and to work with his supervisors to establish a performance plan for the year. *Id.* Coy and Anthony rated Hayes Minimally Successful on this requirement because he failed during 2007 to work with his supervisors on establishing a performance plan and failed to provide them with self-assessments. *Id.* On June 18, 2007, Anthony asked Hayes to provide him with comments regarding his performance for the year so that they could be incorporated into his mid-year progress review. *Id.* Hayes did not respond. *Id.* at 19. On December 5, 2007, Anthony asked Hayes to provide him with a description of his accomplishments during the year so that they could be reflected in his final performance rating. *Id.* Hayes did not respond. *Id.* On December 14, 2007, Anthony reiterated his request for information about Hayes's accomplishments during the year, but Hayes, again, failed to respond. *Id.* Hayes also did not identify any developmental needs that he had as Procurement Advisor.  *Id.*

Based on the ratings Hayes received on the individual performance outcomes and the administrative requirement, his overall performance rating for 2007 was Minimally Successful. *Id.* This was the first rating Hayes received under the new four-tier rating system. Coy Aff. ¶ 7, May 10, 2010, ECF No. 48-7 (noting that the ratings available were Exceptional, Fully Successful, Minimally Successful, and Unacceptable). Hayes believed

he should have been rated Exceptional but provided no information to Anthony or Coy explaining the basis for his belief. Mot. Summ. J. Ex. 9 at ECF pp. 59–60.

On February 4, 2008, Anthony and Coy gave Hayes a workplan that set forth specific expectations of him for the year. Mot. Summ. J. Ex. 4 at ECF pp. 62–65. Coy also met with him that afternoon to go over the workplan. *Id.* Their hope was that, in light of Hayes's 2007 Minimally Successful rating, the workplan would ensure the "new performance period [would] begin with [Hayes having] a clear understanding of what [was] expected of [him] in 2008." *Id.*

### G. The Performance Improvement Plan

By April 4, 2008, though, Anthony and Coy had determined that Hayes's performance was not improving. Mot. Summ. J. Ex. 11 at ECF p. 67. Coy provided him with a "Performance Update" memorandum that described the deficiencies in his performance. *Id.* He was placed on a Performance Improvement Plan, or PIP, on April 22, 2008. Mot. Summ. J. Ex. 12 at ECF p. 80. The PIP did not affect his pay, job title, work hours, or responsibilities, but it did state that if Hayes did not improve his performance he could be terminated. *Id.* at ECF p. 88. Ultimately, though, no action was taken against him, and he remains procurement advisor with the same pay and hours today.

## II. Legal Standard

### A. Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(c). This standard requires more than the mere existence of *some* factual dispute between the parties to defeat an otherwise properly supported motion for summary judgment; "the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986) (emphasis in original). A material fact is one that, under the substantive law applicable to the case, is capable of affecting the outcome of the litigation. *Id.* An issue is genuine where the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," as opposed to evidence that is "so one-sided that one party must prevail as a matter of law." *Id.* at 248, 252. The nonmoving party's evidence is to be believed, and all reasonable inferences from the record are to be drawn in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S 242, 255 (1986).

### B. Title VII

Title VII of the Civil Rights Act provides that employment decisions by federal employers must be "made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). It also prohibits retaliation against any employee because she "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

The Court considers Hayes's claims of discrimination and retaliation under the traditional *Mcdonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). First, the plaintiff must prove a *prima facie* case of discrimination or retaliation. *Id.* at 802. To show a *prima facie* case of discrimination, a plaintiff must show that "(1) she is a member of a protected class; (2) she suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (citing *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). A *prima facie* case of retaliation, similarly, requires a plaintiff to establish "(1) that he engaged in statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007). If the plaintiff proves a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for its action. *McDonnell Douglas Corp.*, 411 U.S. at 802–04. Finally, if the defendant satisfies its burden, the plaintiff must prove that the defendant's stated reason is pretext for discrimination. *Id.* at 804–05.

In *Brady v. Office of Sergeant at Arms*, the Court of Appeals simplified the district courts' analysis in most Title VII discrimination suits. 520 F.3d 490, 494 (D.C. Cir. 2008); *see also Jones v. Bernanke,* 557 F.3d 670, 678 (D.C.Cir.2009) (holding that the same analysis applies to a retaliation claim). It did so out of a recognition that "[i]n most employment discrimination cases that reach federal court, there is no dispute that the employee has suffered an adverse employment action." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (citations omitted). Thus, because the *prima facie* determination had become a "largely unnecessary sideshow," the Court held that in Title VII disparate-treatment suits, the district court need not determine if the plaintiff makes out a *prima facie* case of discrimination once the defendant has asserted a legitimate, non-discriminatory reason for the challenged actions. *Brady*, 520 F.3d at 494. As a result, the district court will usually be left with "one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted

non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race, color, religion, sex, or national origin?" *Id.* In other words, the Court must determine if the plaintiff has produced enough evidence such that a reasonable jury could find that the defendant's non-discriminatory reasons are mere pretext for the underlying unlawful discrimination.

Despite *Brady*'s admonition that district courts should not pause to examine whether a plaintiff established a prima facie case when an employer offers a legitimate non-discriminatory reason for its actions, HHS argues that many of the alleged adverse actions Hayes identifies are not sufficiently serious to support a discrimination or retaliation claim under Title VII. Therefore, the Court first considers whether the asserted employment actions are sufficiently adverse to constitute adverse employment actions (or materially adverse employment actions in the retaliation context) under Title VII. *See Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008) (proceeding directly to the *Brady* analysis may be premature, and courts should first assess whether there is evidence of an adverse action where that fact is contested). Assuming they are, the Court will then consider whether there is sufficient evidence for a reasonable jury to conclude that HHS's proffered non-discriminatory reason for taking those actions is actually pretext to cover up underlying discrimination or retaliation.

The *prima facie* case standards for Title VII discrimination and retaliation claims both contain the term "adverse action," but "the concept [] in the retaliation context is broader than in the discrimination context, and can encompass harms unrelated to employment or the workplace 'so long as a reasonable employee would have found the challenged action materially adverse.'" *Franklin v. Potter*, 600 F. Supp. 2d 38, 66

(D.D.C. 2009) (citing *Baloch*, 550 F.3d at 1198 n.4). For an employment action to be adverse in the discrimination context, it must result in "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002). Accordingly, an adverse employment action is defined as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." *Id.* at 552 (internal citation and quotation omitted). Alleged acts of discrimination that do not constitute adverse employment actions cannot serve as the basis for a Title VII action. *Brantley v. Kempthorne*, 2008 WL 2073913, at *4–*5 (D.D.C. May 13, 2008).

For an employment action to be materially adverse in the retaliation context, it must be "harmful to the point that it could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006). Finally, because of the difficulty of establishing discriminatory intent, "an added measure of rigor . . . or caution . . . is appropriate in [deciding] motions for summary judgment in employment discrimination cases." *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997) (internal quotation marks and citations omitted), rev'd on other grounds, 156 F.3d 1284 (D.C. Cir. 1998) (en banc).

### III. Analysis

This Court's Local Rule 7(b) states:

Within 11 days of the date of service or at such other time as the court may direct, an opposing party shall serve and file a memorandum of points and authorities in opposition to the motion. If such a memorandum is not

> filed within the prescribed time, the court may treat the motion as
> conceded.

Rules of the United States District Court for the District of Columbia, LCvR 7(b). Courts in this Circuit have interpreted Rule 7(b) to mean that when a plaintiff files an opposition to a dispositive motion that addresses only certain arguments the defendant raises, a court may treat those arguments the plaintiff fails to address as conceded. *FDIC v. Bender*, 127 F.3d 58, 67–78 (D.D.C. 2002). The D.C. Circuit has stated that "the discretion to enforce . . . [R]ule [7(b)] lies wholly with the district court," *id.* at 67–68 (citing *Twelve John Does v. District of Columbia*, 117 F.3d 571, 577 (D.C. Cir. 1997)), and noted that it "ha[s] yet to find that a district court's enforcement of this rule constituted an abuse of discretion." *Id.* (citation omitted). Accordingly, because Hayes had the opportunity to respond to all of the challenges to his claims, the Court will construe his failure to respond to several of those challenges as a concession that HHS should prevail on them.

Specifically, Hayes does not respond to HHS's challenges to five of his claims: (1) that Coy discriminated and retaliated against him by placing Anthony in the Acting Deputy Director position; (2) that his 2006 performance appraisal shows discrimination and retaliation; (3) that Coy discriminated and retaliated against him by monitoring his work; (4) that Coy discriminated and retaliated against him by criticizing his work; and (5) that Coy discriminated and retaliated against him by giving him duties outside of his position description. With that much of the underbrush cleared, three claims remain: (1) that Coy discriminated and retaliated against him by placing Anthony in the Permanent Deputy Director position; (2) that his 2007 performance appraisal shows retaliation; and (3) that his placement on the PIP was both discriminatory and retaliatory. The Court will address each of the remaining claims in turn.

### A. Permanent Deputy Director Position

#### 1. HHS has produced admissible evidence to show that Coy believed Anthony was more qualified than Hayes for the Deputy Director position.

Hayes claims that Coy's failure to select him for the Permanent Deputy Director position was discriminatory and retaliatory. Coy responds that neither a retaliatory nor a discriminatory animus tainted his motivations in making the decision to hire Anthony for the position. Instead, he puts forward a legitimate justification for the decision, namely that Hayes was far less qualified for the position than Anthony. The question before the Court, then, is whether Hayes has put forward sufficient evidence for a jury to be able to infer reasonably that Coy's explanation is pretext to cover up his true discriminatory or retaliatory motives.

Hayes does not dispute that Anthony was actually more qualified than he was for the position. Instead, Hayes argues that "[b]ecause Defendant's brief does not support his alleged reason with admissible evidence, it is insufficient to defeat the inference of discrimination and retaliation raised by plaintiff's *prima facie* case." Opp'n Mot. Summ. J. 19, October 5, 2010, ECF No. 55. The brunt of Hayes's argument is that Coy must show that he—Coy himself—honestly believed that Anthony's qualifications were better. Therefore, evidence like Anthony's Affidavit or his resume will not suffice.

Hayes is correct that what matters is Coy's honest belief about Hayes's and Anthony's relative qualifications and not what those qualifications actually are or what a reasonable person would think they are. *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("[T]he issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers."); *see also*

*Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1296 n.14 (D.C. Cir. 1998) (concluding that

where it was unclear that a supervisor was aware of one aspect of the plaintiff's

experience, the court would not rely on that aspect of his qualifications when deciding

summary judgment based on the supervisor's contention that he legitimately chose

someone over the defendant because of their superior qualifications). The problem is that

there is admissible evidence that Coy considered Anthony more qualified. For instance, at

his deposition, Coy said that it was apparent at the interview that Anthony "had answers

that were cogent and thoughtful and Hayes was not so much." Coy Dep. 135–36.

Moreover, when specifically asked during the administrative process why he selected

Anthony for the Deputy Director position, Coy said:

> Mr. Anthony was prepared for the interview and came with specific
> answers to questions. His last number of evaluations were Outstanding
> and his resume provided a long list of awards and qualifications. He is and
> was a current supervisor and has been continuously for several years. Mr.
> Anthony is a seasoned and highly thought of manager well versed in
> almost all of the issues that the Office of Administration deals with. His
> grants, financial management, policy, and management experience made
> him an excellent candidate. Mr. Hayes' response to the Solicitation of
> Interest indicated a finite level of interaction with senior level managers
> within ACF, the Department, and other federal government agencies. His
> resume indicated that his leadership skills and experience was leading a
> team of contractors to develop and teach staff on how to use the
> Procurement Tracking System, his last supervisory role was in January
> 2001. Mr. Hayes last several evaluations assessed him by the previous
> Deputy as Excellent. He did not appear to be prepared for the interview
> process.

Mot. Summ. J. Ex. 14 at ECF p. 7, May 24, 2010, ECF No. 48 (submitted with the Reply

in Support of the Motion for Summary Judgment). Finally, beyond explicitly stating that

he chose Anthony because of his superior qualifications, Coy was clearly aware of their

relative qualifications from having supervised both of them. Coy supervised Anthony for

several years in his role as a Division Director in the Office of Administration, indicating

intimate knowledge of Anthony's job duties. Anthony Dep. 12–13, Apr. 20, 2009, ECF No. 48-8. He also signed all of Anthony's performance appraisals during this time period, indicating awareness of Anthony's performance over a long period of time. Mot. Summ. J. Ex. 15 at ECF p. 16. Furthermore, Anthony submitted a resume to Coy as part of his application for the Deputy Director position. *Id.* at ECF pp. 18–19; Coy Dep. 127. That resume outlined his superior qualifications, including having "[m]anaged every Financial Management Function in ACF, including Division of Discretionary Grants, Division of Grants Policy, Division of Acquisition Management, and Office of Financial Services." *Id.* He would have also, therefore, known that Anthony had "unlimited signature authority" as a "Contracting Officer" and a "Grants Officer," and that he had "[d]irect and substantial experience managing all types of Federal financial assistance— discretionary, block, formula, and entitlement grants." *Id.* Finally, Coy watched both Hayes and Anthony interview and was able to compare their abilities to prove their qualifications on an even playing field, back to back, with two outside opinions to ensure fairness.

Hayes points to one portion of Coy's Declaration that he claims shows that "Coy did not even say, even summarily, that he selected Anthony because his qualifications were superior." Opp'n Mot. Summ. J. 19–20. Pointing out that this one section from Coy's Declaration does not contain the magic words, "I chose Anthony because he was more qualified than Hayes for the position," does not in any way prove that Coy did not choose Anthony for that reason. Indeed, as discussed above, when asked point-blank why he chose Anthony, Coy explained how Anthony was better-qualified in detail, displaying his intimate knowledge of both candidates' qualifications and his own reasonable

assessment of Anthony's as better for the Deputy Director position than Hayes's. Therefore, Hayes's argument that HHS has not produced admissible evidence to support its legitimate explanation for choosing Anthony over him for the Deputy Director position fails.

> ### 2. Hayes raises a genuine issue of material fact regarding whether Coy's contention that he chose Anthony for Deputy Director is pretext to cover up a retaliatory motive.

Hayes proceeds to argue that even if this Court decides that Coy has met his burden of putting forward a neutral, nondiscriminatory, nonretaliatory justification for placing Anthony instead of him in the Deputy Director position, the record contains sufficient evidence for a reasonable jury to conclude that Coy's proffered reason is mere pretext. Mot. Summ. J. 21. The Court considers each of Hayes's five arguments in turn.

First, he argues that "[w]hile Coy and the other two members of the selection panel claim that there was 'unanimous' or 'mutual' agreement as to the reasons Anthony was to be chosen over Hayes, their accounts of this supposed agreement are inconsistent with one another." *Id.* Such inconsistency, Hayes argues, would allow a reasonable jury to infer a discriminatory and retaliatory motive on the part of the employer. *Id.* (citations omitted). This argument is unpersuasive because HHS never claimed that the panel members were unanimous in their *reasons* for choosing Anthony. Rather, it claims that the panel members were unanimous in their *ultimate decision* to choose Anthony over Hayes, and there is clearly more than enough evidence to prove that. *See* Dawson Dep. 50 ("Q. And you thought Anthony was the better candidate? A. I did. Q. Because he had a broader scope to his answers to the questions? A. That's one reason, yes."); Pereira Dep. 69 ("But we have two candidates, and of the two, [Anthony] is by far the better

candidates, based on the answer that he provided during the interview."); *id.* at 73–74 ("Q. And the interview for him took 30 to 40 minutes also? A. yes. Q. Good. And all three of you had the same conclusion? A. Yes."); Coy Dep. 135–36 (Q. And what was your decision? A. Well, after discussing it with the panel it was unanimous. Q. It was unanimous. In other words, the panel's view was unanimous? A. Yes. Q. That Joel Anthony should be the Deputy, right? A. Yes."). Thus, the agreement that all three panelists reference is an agreement that Anthony should be selected for the position, *not* that all three have precisely the same reasons for drawing that conclusion.

One reason for having a panel interview is to get different points of view. If three people all have different, but valid, reasons for choosing Anthony over Hayes, then Coy can feel that much more comfortable about making that selection. If everyone thought about hiring issues and viewed candidates in precisely the same way, little could be gained by having a panel interview. Thus, it would be unsurprising if the panelists did not have precisely the same reasons for choosing Anthony. That said, contrary to Hayes's contention, the panelists actually did agree—by and large—in their reasons for selecting Anthony over Hayes. Dawson testified as follows:

Q. And you thought Anthony was the better candidate?

A. I did.

Q. Because he had a broader scope to his answers to the questions?

A. That's one reason, yes.

Q. And Mr. Hayes was more narrow to his role in the Office of Administration?

A. Yes.

Dawson Dep. at 50. She went on to testify that: "I believe, in terms of the two—comparing the two interviewees, that Mr. Hayes' responses were much more narrow and sort of not clearly, in my opinion, understanding the scope and the breadth of the functions that were in that office, compared to—Anthony who seemed to know a lot about—a lot of different areas." *Id.* at 53.

Pereira also explained his specific reasons for recommending that Anthony be selected. He said that Anthony's answers to the interview questions "were more comprehensive" than Hayes's. (Pereira Dep. at 69–73). He went on to explain that Hayes did not "seem to be taking [the interview] seriously," *id.* at 64, and that he was staring at the ceiling during the portions of the interview. *Id.* at 80–81. Thus, Pereira believed that "based on the answers that he provided during the interview," Anthony was "by far the better candidate." *Id.* at 69.

Coy also testified to the same effect, saying, "[I]t was apparent . . . that Mr. Anthony had prepared for the interview, [and that he] had answers that were more cogent and thoughtful and Mr. Hayes was not so much." Coy Dep. 136; *see also* Mot. Summ. J. Ex. 14 at ECF p. 7 ("Mr Anthony was prepared for the interview and came with specific answers to questions.") (submitted with the Reply in Support of the Motion for Summary Judgment). Accordingly, Hayes's first argument is unpersuasive.

Hayes's second argument is that a reasonable juror could conclude that Coy did not have sufficient information to honestly believe that Anthony's qualifications were better than Hayes's. Opp'n Mot. Summ. J. 23–25. He says that Coy admitted at his deposition that he had little or no knowledge of either Hayes's or Anthony's qualifications and that therefore a reasonable jury could find that he did not honestly

select Anthony based on qualifications. *Id.* at 25. As an example, Hayes points out that Coy did not have knowledge of Anthony's supervisory duties in his position prior to coming to the Office of Administration. *Id.* at 23–24 (citing Coy Dep. 25–26). But the passages Hayes cites do not support his argument. Coy was asked questions during his deposition regarding his knowledge of Anthony's and Hayes's qualifications *upon assuming the Deputy Assistant Secretary position* in 2002. At that time, Coy did not know either of them well.  Coy Dep. 188–89. In working with the two of them for several intervening years, however, and in filling the Deputy Director position, Coy learned each of their respective qualifications well, as discussed above.

Third, Hayes argues that a reasonable jury might find Coy's argument pretext because on the one hand, he stressed the crucial role Anthony's grants experience played in his decision, but on the other, he hired Velasco—a non-African American who had not engaged in EEO activity—as his Deputy Director even though he had no grants experience whatsoever. *Id.* at 25. This argument might be persuasive if the Velasco decision and the Anthony decision were the same except for the prior EEO activity and race of the applicants. But that is not the case. Instead, Hayes presents no evidence that Coy chose Velasco over a similarly situated candidate with grants experience. In fact, he does not even show that Coy had the option of choosing a candidate with grants experience when he made the Velasco decision. The Anthony decision was different in that Coy had one applicant with a great deal of important grants experience and another candidate with none. Moreover, Coy testified that there were other reasons for choosing

Anthony as well. This argument, then, fails to raise a genuine issue of material fact.[2]

Fourth, Hayes argues a reasonable jury could conclude that Coy lied about having convened the interview panel in order to ensure that "everything was fair and above board transparent." *Id.* at 25–26. He says that Pereira and Dawson both claimed that Coy's method of interviewing the candidates was out of the ordinary and notes that the panelists came into the interview with very little information about the candidates or the position for which they were applying. *Id.* at 25. Therefore, the argument goes, a reasonable jury could conclude that "Coy failed to give the panel and Hayes information about the position to give Anthony a competitive advantage in the selection process," because Anthony was the Acting Deputy Director for several months leading up to the interviews and would know the position better. *Id.*

There are two problems with Hayes's argument. First, Coy was not required to give out any more information than he did. Indeed, Hayes points to no evidence that Coy was required to conduct an interview at all. Second, as to the allegation that Anthony had a leg up because he was Acting Deputy Director, that may be true, but if it is, it is only because he was actually better-qualified. Experience in the position being interviewed for is a legitimate and valuable qualification to have coming into an interview—assuming one has done a decent job in the position, as Anthony apparently had. But that does not mean that Coy "rigged" things for Anthony. Any advantage Anthony had, even under Hayes's argument, was directly linked to his superior qualifications.

Fifth, Hayes argues that the record contains evidence of Coy's retaliatory attitude upon which a reasonable jury could infer that his true reason for not selecting Hayes for

---

[2] The same can be said for Hayes's argument that Coy did not know that Velasco had supervisory experience and yet he contends that Anthony's supervisory experience was very important to his decision. *Id.*

the Deputy Director position was retaliatory animus. *Id.* at 27. He points to three examples to justify his claim. First, at his deposition, Coy was asked, "You looked into [Hayes's] background, however, didn't you? . . . You're a careful manager. You got a new staff advisor. You wanted to know what he knew and what his experience was, didn't you? . . . ." *Id.* (citing Coy Dep. 189–90). Coy responded, "I didn't look into Mr. Hayes' background . . . It was a result of an EEO settlement. He didn't get put here because of any merit. It was because of an EEO settlement." *Id.* Second, he points to Coy's reaction to another employee's successful EEO case. Opp'n Mot. Summ. J. 28. Coy said that the verdict "ha[d] shaken [him] in a way that other significant events in [his] recent past haven't done." *Id.* It was also evident to his staff that Coy was "very upset" by the verdict. *Id.* (citing Anthony Dep. 137). Third, Rhett Leverett, the EEO counselor who interviewed Coy regarding Hayes's complaint, testified as follows:

> Mr. Coy was a bit agitated, perhaps angry. He was not happy about this case was my feeling that I got from the phone conversation. He was somewhat hostile. He did not enjoy talking to me. He was angry that Mr. Hayes had brought the case, and he said to me while he's carrying on, "Mr. Leverett, it is morally repugnant," and he said it with great conviction that he brought this case. And he goes, "I want you to put that in the report." He ordered me to state that directly. I've never had a manager do that in 200 cases. And I said, "Yes, sir." . . . . He specifically directed me to put that statement in the report, because he was so upset that Mr. Hayes brought this case. That was a direct quote at his request in a kind of nasty way . . . . I have never had anyone demand that before that I put their quote in the report, because he was not happy, and he conveyed that to me from the very beginning of the phone conversation to the end that he did not like this.

Opp'n Mot. Summ. J. 29 (citing Leverett Dep. 20–21, Apr. 28, 2009, ECF No. 55-8). The EEO counselor further testified that he believed Coy was angered that Hayes had charged him with discrimination in the past and that he was hostile toward Hayes because of the charge. Levertt Dep. 21. The Court will analyze each of these statements in some detail.

First, Coy said, "He didn't get put here because of any merit. It was because of an EEO settlement." Coy Dep. 189–90.  Analyzing this statement in isolation, Coy does not commit himself to *any* view of Hayes's merit. It is technically possible, for example, that Coy believed that Hayes had *infinite* merit; he just did not believe that Hayes became procurement advisor because of it. It is also logically possible, if one analyzes this statement in isolation, that Coy thought Hayes has absolutely *no merit* at all; again, his merit did not play a factor in his acquisition of the procurement advisor position.

But Coy did not make this statement in isolation. It arose in the context of lengthy deposition questioning regarding whether he had—at any point—looked into Hayes's background:

> Q. You're a careful manager. You got a new staff advisor. You wanted to know what he knew and what his experience was, didn't you? A. I didn't look into Mr. Hayes' background. Q. Didn't inquire as to what he had done before so you knew what you could rely on his advice on procurement? You, the careful new head of the Office of Administration here at ACF, didn't do it? A. It was the result of an EEO settlement. He didn't get put here because of any merit. It was because of an EEO settlement.

Coy Dep. 189.  Given this context, a reasonable jury could conclude that Hayes's EEO settlement served as justification—in Coy's mind—for not taking a serious look at Hayes's qualifications as he considered whom to put in the Deputy Director position.  If the jury drew such an inference, then it would appear that Coy viewed Hayes's EEO settlement as a badge of inferiority that justified giving his qualifications short-shrift in future employment decisions.

The second statement has to do with Coy's displeasure at having lost a prior EEO case. This statement has no direct connection to Hayes's EEO activity in this case, and

thus, it could not raise a genuine issue of material fact on its own. Yet, a reasonable jury could conclude from this statement that Coy is hostile to EEO activity in general, making it more likely than it would be in the absence of this evidence that he chose Anthony instead of Hayes in order to retaliate against Hayes for filing an EEO complaint after being passed over for consideration for the Acting Deputy Director position.

The third statement, which arose during Coy's interview with Leverett, tends to show how much Hayes's EEO complaint upset Coy. Although it is understandable that accusations of discrimination would upset an employer, Coy's comments here go beyond that normal displeasure for two reasons. First, his reaction was so extreme that Leverett said he had never seen anything like it in over 200 EEO cases. It was enough to cause the EEO counselor to conclude that Coy was hostile toward Hayes because of the charge. Leverett Dep. 21. Second, Coy found Hayes's complaint "morally repugnant." *Id.* It is one thing to find an accusation of discrimination upsetting. It is quite another to claim that an employee's participation in the EEO process is morally repugnant. Therefore, a reasonable jury could conclude that Coy did not give Hayes a fair shake in the Deputy Director selection process because Coy could not see past what he considered to be the moral repugnancy of Hayes's EEO activities.

Coy argues that some of these statements are insufficient to raise an inference of retaliation because they concern things that happened years before the selection decision at issue. That argument falls short. The Supreme Court has held that where the inference of retaliation hinges *exclusively* on the temporal proximity of the protected activity and the adverse action, they must have occurred "very close" in time to one another. *Clark County School Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) ("The cases that accept

mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'") (citations omitted). Here, though, the inference springs not from the temporal proximity of protected activity and the adverse action but instead from Coy's own words, their hostile tone, and their precise application to the very EEO activity that Hayes took in this case.

A reasonable jury could, therefore, conclude that Coy's explanation that he chose Anthony because he was better-qualified is pretext to cover up his underlying hostility toward Hayes's EEO activity. For that reason, the Court will deny HHS's Motion with regard to this aspect of Hayes's claim.

### B. Minimally Successful Performance Rating in 2007 and PIP Placement

Next, Hayes argues that Coy and Anthony attempted to falsely characterize Anthony as Hayes's supervisor to insulate Coy—who has previously been found guilty of discrimination and retaliation by a jury—from another discrimination and retaliation allegation. *EEOC v. C.G. Schmidt, Inc.*, 670 F.Supp.2d 858, 868–69 (E.D. Wis. 2009) (holding that concealing the involvement of a decision maker who responded to plaintiff's earlier EEO complaint in retaliation case supported an inference of retaliatory motive). It is true that Anthony admits in his Affidavit that he was Hayes's supervisor "in name only." Anthony Aff. 3. Then at his Deposition, Anthony says that Coy "made it clear" that he would be required to supervise Hayes as Deputy Director. Anthony Dep. 110–11. Hayes claims that these inconsistent statements were meant to cover up Coy's involvement in putting him on the PIP and giving him a Minimally Successful rating in 2007. Opp'n Mot. Summ. J. 29–33.

Whatever inconsistencies or tensions there may be in Coy's and Anthony's statements regarding whether and to what extent Anthony supervised Hayes, they can only raise a genuine issue of material fact if a reasonable jury could infer that they were part of a scheme to cover up Coy's involvement in placing Hayes on the PIP and giving him a Minimally Successful rating. In other words, Hayes may not avoid summary judgment simply by finding any inconsistency in Anthony's or Coy's testimony; he must show that the inconsistency could give rise to a reasonable inference of discrimination or retaliation. Other evidence makes clear, however, that no such cover-up was going on.

First, regarding the PIP, because Hayes has not shown that his placement on it "affected [his] grade or salary" or that it constituted a "significant change in employment status," it is not an adverse employment action capable of supporting a discrimination claim. *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003). To sustain a retaliation claim, however, he need only raise a genuine issue of material fact as to whether his placement on the PIP would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–69 (2006). A PIP that does not rise to the level of a materially adverse action for the purposes of a disparate treatment claim may still satisfy this more liberal standard. *See Chowdhury v. Blair*, 605 F. Supp. 2d 90, 96–97 (D.D.C. 2009) (holding that placement on a PIP was materially adverse in the context of a retaliation claim but not materially adverse for disparate treatment purposes because the PIP could dissuade a reasonable employee from engaging in protected activity even if it did not affect the employee's grade or salary).

Coy cites *Kelly v. Mills*, 677 F. Supp. 2d 206, 222 (D.D.C. 2010), for the proposition that "placing plaintiff on a PIP [does not] constitute an adverse employment action," but in the passage referenced, the Court was discussing adverse employment actions for the purpose of a discrimination—not a retaliation—claim. *Id.* Later, in the same opinion, the *Kelly* Court holds that PIP placement can constitute a materially adverse employment action even without grade or salary consequences. *Id.* at 225 (citing *Rochon v. Gonzalez*, 438 F.3d 1211, 1219 (D.C. Cir. 2006). Thus, the Court concludes that Hayes's PIP placement could dissuade a reasonable employee from pursuing a discrimination claim, and it will therefore consider Hayes's arguments on that score.

The record shows that Coy ultimately decided to place Hayes on the PIP, and Coy signed the PIP. Mot. Summ. J. Ex. 12 at ECF p. 80. These undisputed facts contradict Hayes's allegation that Coy sought to cover up his involvement with the PIP placement to conceal his retaliatory motives. The record is similarly clear regarding Hayes's Minimally Successful rating. Coy signed it personally—an action totally inconsistent with the theory that he sought to cover up his involvement in the rating. Mot Summ. J. Ex. 4 at ECF p. 72.

Moreover, there is evidence in the record that Anthony did act as Hayes's supervisor in more than name only. In March 2007, Coy told Hayes that "all correspondence/emails concerning job assignments you are working on should either be routed through Joel [Anthony] as he is the Deputy and your direct supervisor – or at a minimum, he should be cc'd." Mot. Summ. J. Ex. 17 at ECF p. 14. Hayes followed that instruction, and Anthony provided supervisory feedback to him. Mot. Summ. J. Ex. 4 at ECF pp. 76–78. These actions show that Anthony was Hayes's supervisor in more than

name only and that Coy was not trying to cover up his own involvement in Hayes's Minimally Successful rating.

Next, Hayes argues that a reasonable jury could conclude that Coy's inability—at his 2009 deposition—to recall the reasons Hayes was placed on the PIP and given a Minimally Successful performance rating in 2007 would allow a reasonable jury to conclude that Coy's proffered reasons are pretext to disguise a retaliatory motive for the actions. Opp'n Mot. Summ. J. 32–33. The fact that Coy cannot recall those details years later does not show that they were not his reasons at the time he made the decisions at issue, though. In fact, as was discussed at length above, the record is replete with contemporaneous documentation of precisely why Hayes was rated Minimally Successful and placed on the PIP. The Court will therefore grant HHS's Motion with respect to Hayes's PIP placement and Minimally Successful rating claims.

### C. Motivating-Factor Retaliation Claim

Whether Hayes intended it or not, the two paragraphs he tacked on to the end of his Opposition to Summary Judgment articulating a "motivating factor" retaliation claim—innocent though they may appear—present a complicated issue. The D.C. Circuit has twice grappled with motivating-factor retaliation claims, and yet a question remains unanswered in the Circuit: Does Title VII currently permit a motivating-factor retaliation claim? Hayes raises this claim for the first time in his Opposition, and HHS has several responses. For the reasons set forth below, the Court finds that, as a matter of law, Hayes may not bring such a claim.

### 1. The Statute, *Price Waterhouse*, and the 1991 Act

Title VII's discrimination provision provides in relevant part:

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a). And the Act's retaliation provision provides:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an agency, or joint labor-management committee controlling apprenticeship or other training or retraining programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). In 1989, a plurality of the Supreme Court—in the context of a Title VII *discrimination* case—held that once a "plaintiff proves that [the plaintiff's membership in a protected class] played a motivating part in an employment decision, the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken [that factor] into account." *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). *Price Waterhouse* arose in the context of a discrimination claim, but the D.C. Circuit subsequently extended its burden-shifting framework to retaliation cases as well. *See Thomas v. Nat'l Football League Players' Ass'n*, 131 F.3d 198 (D.C. Cir. 1997) (applying *Price Waterhouse* to a pre-1991 retaliation claim under Title VII).

Responding to *Price Waterhouse*, Congress amended several aspects of Title VII in 1991. The purpose of these amendments, as the D.C. Circuit later explained, was "to provide standards for mixed motive cases." *Porter v. Natsios*, 414 F.3d 13, 18 (D.C. Cir. 2005) (citing *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)). The 1991 Act added a provision to Title VII that explicitly provides for employer liability based on evidence that an impermissible consideration was "a motivating factor" in the employer's decision:

> [A]n unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

42 U.S.C. § 2000e-2(m). While codifying *Price Waterhouse*'s recognition of liability in mixed-motives cases, this new provision also overruled one of that case's central holdings by limiting the employer's exposure to certain remedies. This aspect of the Act has come to be called the "same action" affirmative defense:

> On a claim in which an individual proves a violation under section 2000e-2(m) of this title and a respondent demonstrates that the respondent would have taken the same action in the absence of the impermissible motivating factor, the court-
> (i)     may grant declaratory relief, injunctive relief . . ., and attorney's fees and costs . . .; and
> (ii)    shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment . . . .

*Id.* § 2000e-5(g)(2)(B). Thus the 1991 Act's motivating-factor framework allows employees to establish a Title VII violation under § 2000e-2(m) "without proving that an impermissible consideration was the sole or but-for motive for the employment action, while providing the employer with a 'limited affirmative defense' under § 2000e-5(g)(2)(B) 'that does not absolve it of liability, but restricts the remedies available to a plaintiff.'" *Porter*, 414 F.3d at 19 (citing *Desert Palace*, 539 U.S. at 94). This limited affirmative defense abrogated the portion of *Price Waterhouse* that provided a complete

defense in cases where an employer who shows that the illicit motive was not the but-for cause of the employment decision. Both *Price Waterhouse* and the 1991 Amendments, however, dealt only with Title VII discrimination claims.

> **2. The D.C. Circuit recognizes that, in light of the 1991 Act, it is now an open question whether Title VII plaintiffs may bring mixed-motives retaliation claims under *Price Waterhouse* or motivating-factor retaliation claims under the 1991 Act.**

The above discussion makes clear that, following the 1991 Amendments, mixed-motives discrimination cases are subject to the Act's motivating-factor analysis, and not to *Price Waterhouse*'s burden-shifting regime. An open question remains, however, as to what analysis, if any, is proper in the context of mixed-motives *retaliation* claims. As discussed above, the D.C. Circuit previously extended the *Price Waterhouse* framework to retaliation claims, but it has subsequently expressed concern that the 1991 Act may call the legitimacy of this prior extension into question. *Borgo v. Goldin*, 204 F.3d 251, 255 n.6 (D.C. Cir. 2000) ("[W]hile discrimination claims . . . were covered by the 1991 Act, Congress did not expressly include retaliation claims in the provision that modified *Price Waterhouse*. Some circuits have held that retaliation claims are not covered by the Civil Rights Act of 1991 and are still governed by *Price Waterhouse*. This circuit has not addressed that question.") (citations omitted). Five years later, the Court of Appeals reiterated that courts need to examine the 1991 Amendments to determine whether or not the Act's motivating factor analysis should apply with equal force to the retaliation context, but it did not mention whether *Price Waterhouse*'s relevance was still in question. *Porter v. Natsios*, 414 F.3d 13, 19 (D.C. Cir. 2005) ("[A]lthough every circuit to address the issue has held that the mixed motive provisions of the 1991 Act do not apply to retaliation claims, it remains an open question in this circuit.") (citations

omitted).  In sum, it appears there are two open questions. First, does the 1991 Act allow

Title VII motivating-factor retaliation claims? Second, if it does not, may Title VII

plaintiffs still bring mixed-motives retaliation claims under *Price Waterhouse*?

Thankfully, the Supreme Court's recent decision in *Gross v. FBL Servs., Inc.*, 129 S.Ct.

2343 (2009), provides a clear answer to both of these vexatious questions.

3. **The Supreme Court's recent decision in *Gross v. FBL Services, Inc.*, resolves any doubt: Title VII plaintiffs may bring neither mixed-motives retaliation claims under *Price Waterhouse* nor motivating-factor retaliation claims under the 1991 Act.**

Although it was an ADEA case, the Supreme Court in *Gross* construed text that is

in relevant part identical to the language of Title VII at issue here.  Specifically, the

ADEA provides that "[i]t shall  be unlawful for an employer . . . to fail or refuse to hire or

to discharge any individual or otherwise discriminate against any individual with respect

to his compensation, terms, conditions, or privileges of employment *because of* such

individual's age."  29 U.S.C. § 623(a)(1) (emphasis added).  This language is

indistinguishable from Title VII's discrimination and retaliation provisions, both of

which contain the same "because of" formulation.  *See* 42 U.S.C. § 2000e-2(a) ("It shall

be an unlawful employment practice for an employer . . . to fail or refuse to hire or to

discharge any individual . . . *because of* such individual's race, color, religion, sex, or

national origin . . . .") (emphasis added); *id*. at 2000e-3(a) ("It shall be an unlawful

employment practice for an employer to discriminate against any of his employees or

applicants for employment . . . *because* he has opposed any practice made an unlawful

employment practice by this subchapter . . . .") (emphasis added).[3]

---

[3] The Court recognizes that, technically speaking, "because of" and "because" are not *exactly* the same phrasing.  The Court finds, however, that syntactical differences in the respective provisions, rather than any substantive difference in meaning, account for the slight variation here.

In *Price Waterhouse*, the Supreme Court interpreted "because of" in Title VII's discrimination provision and held that "[t]o construe the words 'because of' as colloquial shorthand for 'but-for causation,' . . . is to misunderstand them." *Price Waterhouse*, 490 U.S. at 240 (citations omitted) (going on to hold that the "because of" language allowed plaintiffs to prove Title VII liability merely by showing that their employer's adverse action against them was brought about in part by an illegal motive). The Supreme Court's recent decision in *Gross*, however, makes clear that *Price Waterhouse*'s interpretation of "because of" is flatly incorrect. As an initial matter, the *Gross* Court focused on the proper meaning of this phrase to determine whether a mixed-motives jury instruction like the one permitted under *Price Waterhouse* was available under the ADEA. *Gross*, 129 S.Ct. at 2350 ("Our inquiry therefore must focus on the text of the ADEA to decide whether it authorizes a mixed-motives age discrimination claim. It does not."). It concluded that "because of" in the ADEA means "by reason of," and thus an ADEA "plaintiff must prove that age was the *'but-for' cause* of the employer's adverse decision." *Id.* (emphasis added). Moreover, in reaching this decision, the *Gross* Court called *Price Waterhouse*'s reasoning into question, announcing that "it is far from clear that the Court would have the same approach were it to consider the question [of *Price Waterhouse*'s mixed-motives burden-shifting framework] today in the first instance." *Id.* at 2351–52 (citations omitted). It went on to question *Price Waterhouse*'s wisdom further, noting that "it has become evident in the years since [*Price Waterhouse*] was decided that its burden-shifting framework is difficult to apply." *Id.* at 2351. The Court concluded that "the problems associated with *Price Waterhouse* have eliminated any perceivable benefit to extending its framework to ADEA claims." *Id.* For these same

reasons, as well as the D.C. Circuit's prior recognition that the 1991 Act calls *Price Waterhouse*'s continued viability into question, this Court will not apply that opinion's interpretation of "because of" to Title VII's retaliation provision.[4]

Having foreclosed *Price Waterhouse*'s application to Title VII's retaliation provision in light of the *Gross* Court's criticisms, this Court now turns to whether the 1991 Act provides an independent basis for a motivating-factor retaliation claim. Relying on the *Gross* Court's other reasons for not permitting such a claim under the ADEA, this Court concludes that Title VII, after the 1991 Act, does not permit plaintiffs to bring motivating-factor retaliation claims.

A central basis for the *Gross* Court's holding was Congress's decision to explicitly provide for motivating-factor discrimination claims under Title VII in the 1991 Act while making no similar provision for such claims under the ADEA. As the Court explained, "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *Id.* at 2349 (citations omitted).The Court noted that Congress's inaction was especially important here because it considered and amended both statutes at the same time but chose to provide for motivating-factor claims under one and not the other. *Id.* ("[N]egative implications raised by disparate provisions are strongest when the provisions were considered simultaneously when the language raising the implication was inserted.") (internal quotation marks and citations omitted). In the case currently before the Court, Congress made changes to various parts of Title VII affecting both discrimination and retaliation claims. When it came to crafting the motivating-factor analysis, however, it amended one section of Title VII and was silent

---

[4] It bears noting that the *Gross* Court had no occasion to overrule *Price Waterhouse* even if it was so inclined because *Price Waterhouse* was a Title VII case—not an ADEA case like *Gross*. Thus, the fact that the Court called *Price Waterhouse* into question takes on greater than normal significance.

*as to another provision of Title VII*. Thus, the inference that Congress considered both provisions and was therefore intentional in its disparate application of the motivating-factor provision applies with even greater force here.

The *Gross* Court also held that Title VII's structure made clear that the 1991 motivating-factor amendment *only* applies to Title VII's discrimination provision. It pointed out that Congress's 1991 amendment to Title VII not only explicitly added motivating-factor liability to Title VII, but also eliminated the employer's complete affirmative defense to motivating-factor claims. 42 U.S.C. § 2000e-5(g)(2)(B). "If such 'motivating factor' claims were already part of Title VII," the Court explained, "the addition of § 2000e-5(g)(2)(B) alone would have been sufficient." *Id.* at 2352 n.5. The Court thus concluded that "Congress's careful tailoring of the 'motivating factor' claim in Title VII, as well as the absence of a provision parallel to § 20003-e2(m) in the ADEA, confirms that we cannot transfer the *Price Waterhouse* burden-shifting framework into the ADEA." *Id.* This argument applies with even greater force to the case currently before the Court, and Congress's 1991 motivating-factor amendment to Title VII must apply *only* to discrimination claims. Otherwise, as the *Gross* Court explained, Section 2000e-5(g)(2)(B) would have been sufficient on its own to make the adjustment Congress allegedly intended. Thus, the only construction that gives meaning both to Section 2000e-5(g)(2)(B) as well as the motivating-factor provision without reading either as surplusage is one that restricts the motivating-factor provision's application to Title VII discrimination claims only.

Other relevant considerations of statutory construction also weigh in favor of this Court's conclusion that Title VII plaintiffs may not bring motivating-factor retaliation

claims. For example, Section 102 of the 1991 Act makes clear that if Congress had wanted to mention motivating-factor claims in Title VII's retaliation provision, it knew how to do so. That Section provides that compensatory and punitive damages are available in actions brought under both Title VII's discrimination provision and its *retaliation* provision. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russell v. United States*, 464 U.S. 16, 23 (1983) (internal quotation marks omitted). Because Congress altered the nature of retaliation claims elsewhere in the 1991 Act, but not in the motivating-factor amendment itself, it is proper to assume that the motivating-factor amendment does not apply to retaliation claims.

Section 2000e-5(g)(2)(B) of the 1991 Act provides yet another example. As set forth above, this provision governs remedies when a plaintiff proves that an impermissible factor motivated the decision, but the defendant shows that the illicit factor was not the but-for cause of its decision. It also does not mention retaliation. Yet Section 2000e-5(g)(2)(A), the subsection that *immediately precedes* it, *does* reference claims brought under Title VII's retaliation provision. *See, e.g.*, *Woodson v. Scott Paper Co.*, 109 F.3d 913, 934 n.24 (3d Cir. 1997) (citing *Riess v. Dalton*, 845 F.Supp. 742, 744 (S.D. Cal. 1993) ("The fact that Congress expressly treated Section 2000e-3(a) violations in such close proximity to Section 107(b) demonstrates that where Congress intended to address retaliation violations, it knew how to do so and did so explicitly.")). Simply put, this Court finds it difficult to believe that the absence of motivating-factor language in Title VII's retaliation provision is the result of accident.

Finally, under the principle of statutory construction commonly referred to in its Latin form as *inclusio unius est exclusio alterius*, Congress precluded its 1991 motivating-factor amendment's application to Title VII retaliation claims by expressly declaring that the analysis applies "when the complaining party demonstrates that *race, color, religion, sex, or national origin* was a motivating factor for any employment practice, even when other factors motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). The text of the Act provides the limited universe of factors to which its analysis applies, and the Court concludes that Congress precluded its application to any other factors, including retaliation.

The 5th Circuit has argued that applying the *Gross* rules discussed above to Title VII cases ignores the Supreme Court's admonition in *Gross* that courts should be very careful when applying rules applicable under one statute to a different statute. *See Smith v. Xerox Corp.*, 602 F.3d 320 (5th Cir. 2010) (arguing that applying *Gross*'s reasoning in the Title VII context ignores *Gross*'s admonition). In *Smith*, Xerox argued that the district court erroneously instructed the jury on the burden of proof by allowing it to find for Smith on her retaliation claim with only "motivating factor" rather than "but-for" causation, thereby improperly shifting the ultimate burden of persuasion to Xerox. The 5th Circuit affirmed the district court and held that Title VII's retaliation provision allows mixed-motives claims despite the arguments above. In doing so, it "recognize[d] that the *Gross* reasoning could be applied in a similar manner to the instant case." *Id.* at 328. It also recognized that "[t]he text of § 2000e-2(m) states only that a plaintiff proves an unlawful employment practice by showing that 'race, color, religion, sex, or national origin was a motivating factor.' It does not state that *retaliation* may be shown to be a

motivating factor." *Id.* (quoting 42 U.S.C. § 2000e-2(m)) (emphasis in original). It even recognized that although Congress amended Title VII to add § 2000e-2(m) in 1991, "it did not include retaliation in that provision." *Id.* Having summarized all of these very persuasive arguments, the *Smith* Court said, "These considerations are, of course, similar to the Supreme Court's reasoning in *Gross*, and Xerox understandably urged at oral argument that *Gross* dictates the same conclusion here . . . ." *Id.* Yet, it concluded that "such a simplified application of *Gross* is incorrect." *Id.*

The Fifth Circuit's reasoning rests almost entirely on one argument. Noting that it was dealing with a Title VII case—not an ADEA case—the court invoked the Supreme Court's admonition in *Gross* that courts "must be careful not to apply rules applicable under one statute without careful and critical examination," and held that *Price Waterhouse* and the Court's other Title VII precedents remained its "guiding light." *Id.* This Court has already explained at length above why it does not believe that *Price Waterhouse* applies to this question after *Gross*. The Court now turns to two reasons it concludes that the *Smith* Court is mistaken.

First, this Court does not violate the admonition in *Gross* when it applies *Gross*'s teachings on statutory interpretation to the Title VII context. This is because *Gross*'s admonition was limited to the application of *rules of law* developed under one statute to another statute "without careful and critical examination." *Gross*, 129 S.Ct at 2349. The 5th Circuit extends this admonition to include not only rules of law but also *rules of statutory construction*. There is a critical difference between a rule of law developed under a certain statute and the rules of statutory construction implemented to derive that rule of law. The former is unique to the statute at issue, but the latter by its very nature

applies generally. Indeed, the *Gross* Court's reasoning itself provides a prime illustration of this distinction. The *Gross* Court cited to *Lindh v. Murphy*, 521 U.S. 320, 330 (1997), for the proposition that "negative implications raised by disparate provisions are strongest when the provisions were considered simultaneously when the language raising the implication was inserted." 129 S.Ct. at 2349 (internal quotation marks omitted). That is a rule of statutory construction, but under the 5th Circuit's logic in *Smith*, it would be "contrary to *Gross*'s admonition against intermingling interpretation of the two statutory schemes" for the Supreme Court to rely on it because *Lindh* was an AEDPA—not an ADEA—case. Just as there was nothing improper about the *Gross* Court relying on *Lindh*, there is nothing improper about this Court relying on *Gross*'s teachings on statutory construction.

Second, even if *Gross* had never been decided, many of the arguments this Court made above would still apply. It is not as though *Gross* was the first case to hold that courts should look to the text of a statute when interpreting it. Nor was it the first to recognize that when Congress amends one provision of a statute but not another, it can be interpreted to have signaled its intention not to apply the amendment to the unaffected provision. Moreover, the *Gross* Court did not closely analyze the precise language of Title VII's retaliation provision—because that provision was not at issue there—but analysis of that provision shows that its text plainly indicates its exclusion of motivating-factor retaliation cases under the principle of *inclusio unius est exclusio alterius*. Therefore, wholly apart from *Gross*, this Court would find that Title VII does not allow motivating-factor retaliation claims.

For these reasons, this Court holds that—as a matter of law—Hayes may not bring a motivating-factor retaliation claim under either *Price Waterhouse*'s burden-shifting regime or under the motivating-factor provisions of the 1991 Act. Summary judgment is therefore appropriate as to this aspect of Hayes's case. Because the Court concludes that he may not bring this claim as a matter of law, it declines to address HHS's remaining arguments on the matter.

## IV. Conclusion

For the reasons discussed above, the Court denies HHS's Motion for Summary Judgment regarding Hayes's retaliation claim as it applies to HHS's denial of his application to be Deputy Director and grants the Motion in every other respect. A separate Order memorializing this Opinion will issue today.

Date: February 2, 2011          /s/ Royce C. Lamberth
                                Chief United States District Judge